MELLOY, Circuit Judge.
Shana Donathan appeals the district court’s adverse grant of summary judgment on her employment claim alleging retaliatory termination. Because a reasonable jury could conclude her protected action was the but-for cause of her termination, we reverse the judgment of the district court.
I. Background
Defendant Oakley Grain, Inc., a wholly owned subsidiary of Defendant Bruce Oakley, Inc., operates grain facilities in Missouri and Arkansas. Defendant Dennis Oakley is president of both companies. Charlie Porter manages two of Oakley Grain’s facilities, the Yellow Bend and Pendleton facilities.
Oakley Grain hired Donathan in August 2010 to work at the Yellow Bend facility in Arkansas City, Arkansas. Donathan’s initial duties included various tasks, primarily answering phones and weighing and grading grain. Shortly after Donathan was hired, another employee quit and Dona-than’s duties expanded to include payroll functions. When needed, for example if Yellow Bend closed due to flooding or if Pendleton was short staffed, Donathan would report to the Pendleton facility. Throughout her employment, Donathan’s work occurred primarily indoors in an office or at the indoor controls of remotely controlled grain-measuring equipment. Workers at Yellow Bend, however, were expected to serve multiple functions, and she occasionally worked outdoors around grain elevators or barges. In 2011, 2012, and 2013, Donathan received raises. Porter characterizes Donathan as a good employee with a good work ethic, and the record contains no evidence of poor reviews, prior discipline, or anticipated discipline.
Donathan learned that her brother, also an Oakley Grain employee, had received “harvest and safety bonuses” as an employee at the Pendleton facility. Donathan understood generally that other employees received such bonuses. On Thursday, January 23, 2014, Donathan sent an email to Dennis Oakley containing a letter detailing her history with the company, complaining about the fact that she had not received bonuses, and complaining that new employees she was required to train were starting at higher rates of pay than her. Regarding bonuses, she wrote, “I see no difference in my position and the ones performed by the grain department at Pendleton for example except the fact that I am female.” It appears undisputed that Oakley Grain’s bonus policy treated outdoor workers as eligible for safety bonuses and workers at profitable facilities as eligible for harvest bonuses. Donathan argued in her letter that her duties included outdoor work such that she should have been bonus eligible. Defendants assert in this case that the Yellow Bend facility has never been profitable and that Donathan was not an outdoor worker.
Dennis Oakley forwarded the email to Porter about ten minutes after Donathan sent the email. Dennis Oakley then called Porter who had not yet read the email. After Porter took a moment to read Dona-than’s complaint, the men discussed the complaint. Porter asserts that, during the phone call, he told Dennis Oakley he was going to lay off employees to save money after finishing the intake of corn. According to Porter’s deposition in this case, the Yellow Bend facility was to receive the final truckloads of corn from an outstanding order; Porter expected to complete that order soon; and a work slowdown was *738 anticipated following completion of that order.
Approximately two hours later, still on January 23, Porter forwarded the email to an employee named Fletcher Calvert, a grain merchandiser for Oakley Grain at a different facility. Calvert almost immediately forwarded the email to J.O. Norman, an operations manager and merchandiser for Oakley Grain at a different facility. Calvert and Norman had no supervisory role over Donathan and generally , did not work with Donathan. During depositions in this case, Porter denied knowledge as to why he had sent the email to Calvert or why Calvert would have sent the email to Norman. Donathan stated the atmosphere at work changed after she sent her email.
On the morning of Friday, January 31, 2014, eight days after Donathan sent her email to Dennis Oakley, Oakley Grain terminated the employment of five workers at Yellow Bend, including Donathan. Porter was not present on the morning of January 31; rather, he prepared typed notices and instructed another employee to deliver the notices. The notices thanked the terminated employees for their service, stated the terminations were attributable to a lack of work, and indicated the company hoped it could employ the workers in the future. The notices did not instruct employees to work the remainder of the day nor did the notices instruct the employees to leave work immediately. Donathan’s notice stated, “It is with regret that I inform you are being laid off from your position as a grader and weighier (sic) effective January 31, 20U.”[1] (emphasis added). Donathan left after receiving the notice, but the other four affected workers remained at the facility for the rest of the day.
It is undisputed that, in prior years, Oakley Grain had laid off seasonal, non-office workers at Yellow Bend due to seasonal work demands. During Donathan’s several years of employment, however, Oakley Grain had never laid off Donathan. Further, the woman who preceded Dona-than in her position similarly had not been terminated with seasonal workers.
Of the five employees terminated on January 31, three were temporary outside workers and two were non-temporary or “regular” workers: Donathan and plant supervisor Doug Wilson. Oakley Grain admits it terminated Wilson at least in part due to performance concerns. Porter stated Wilson was a good worker, but did not possess the skills to serve in the particular maintenance-related job for which he was hired. Oakley Grain does not suggest it terminated Donathan for performance reasons. In a note to Dennis Oakley, Porter reported letting Wilson and Donathan go, but did not report letting the other three workers go. In response, Dennis Oakley stated, “laid off?” Porter responded, ‘Yes.”
The following Monday, February 3, 2014, Oakley Grain hired back the three temporary outside workers. Oakley Grain also hired a replacement for Donathan, Maggie Fletcher. Fletcher was not licensed to weigh and grade grain and did not possess experience similar to Dona-than’s. Oakley Grain admits Fletcher issued grain receipts bearing Donathan’s name and asserts the receipts bore Dona-than’s name because the company’s computer system automatically generated the receipts and the system had not been up *739 dated. Company emails, however, reveal employees discussing the fact that Fletcher actually forged Donathan’s signature on handwritten grain slips and that Fletcher misspelled Donathan’s name when doing so.[2] Fletcher remained continuously employed by Oakley Grain at the Yellow Bend facility at least through the date of Porter’s deposition on July 27, 2015. The office position occupied by Donathan, therefore, was filled the first working day after Donathan’s termination and remained filled thereafter.
Donathan filed an EEOC complaint, received a right-to-sue letter, and filed the present action. Donathan alleged wage discrimination and retaliation in violation of the Equal Pay Act, Title VII, and the Arkansas Civil Rights Act. The district court granted summary judgment on the discrimination claims, and Donathan does not appeal that ruling.
Regarding the retaliation claims, Defendants argued that Norman secured a new grain contract for delivery to Yellow Bend on the Saturday after Donathan’s termination, thus creating a surprise new demand for labor at Yellow Bend. Defendants also argued the three seasonal laborers who had just been terminated were rehired, but Donathan was not rehired, because Donathan alone had failed to finish the workday on the Friday of the terminations. The district court concluded a jury would have to believe Defendants’ version of the facts and granted summary judgment. Donathan appeals.
II. Discussion
We review a grant of summary judgment de novo, viewing the record in the light most favorable to the non-moving party. Gibson v. Geithner, 776 F.3d 536, 539 (8th Cir. 2015). Viewing the record in this light means drawing inferences in favor of the non-moving party where the evidence as a whole would permit a rational trier of fact to do so. Ricci v. DeStefano, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (“Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.” (citation omitted)). The non-moving party, however, “may not rely on allegations or denials, but must demonstrate the existence of specific facts ... supported by ‘sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.’ ” Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (citation omitted) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (second alteration in original)).
“To survive a motion for summary judgment on a retaliation claim, [a plaintiff] must offer direct evidence of retaliation or create an inference of retaliation under the McDonnell Douglas burden-shifting framework.” Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016). “Direct evidence in this context is not the converse of circumstantial evidence.... Rather, direct ... refers to the causal strength of the proof.” Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). The plaintiffs ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the “but-for cause” of the adverse employment action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. -, 133 S.Ct. 2517, 2528, 186 L.Ed.2d 503 (2013) (rejecting the more *740 lenient “motivating factor” standard that applies to Title VII discrimination claims).[3] And we apply the familiar McDonald Douglas burden-shifting analysis even when the applicable standard of proof requires a showing of but-for causation. See Shirrell v. St. Francis Med. Ctr., 793 F.3d 881, 888 (8th Cir. 2015) (applying the McDonnell Douglas framework to a Title VII retaliation claim using the but-for standard articulated in Nassau.).
Pursuant to the burden-shifting analysis, the plaintiff bears the initial burden to establish a prima facie case. This burden requires the plaintiff to demonstrate she participated in protected conduct and suffered an adverse employment action. Musolf v. J.C. Penney Co., 773 F.3d 916, 918 (8th Cir. 2014). The plaintiff must also demonstrate a causal connection between the protected conduct and the adverse action. Id. “The burden to show a prima facie case is not difficult.” Id at 919.
As a means of focusing the balance of the court’s analysis and the parties’ arguments, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Torgerson v. City of Rochester, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc).
If the employer articulates a legitimate reason for the adverse employment action, the plaintiff may create a triable question as to retaliation by showing the employer’s articulated reason was not the true reason for the adverse action. Id. On a fully developed summary judgment record, this final step of the burden-shifting analysis merges with the ultimate burden of proof which remains at all times on the plaintiff. Id.[4]
In the present case, it is undisputed that Donathan’s letter complaining of unequal pay based on her sex was a protected act. It is also undisputed that Donathan suffered an adverse employment action. We note Defendants focus most of their argument on the failure to rehire on Monday, arguing Donathan’s leaving on Friday provides the non-retaliatory reason for not rehiring her. Donathan, on the other hand, focuses on the Friday termination. We agree the alleged retaliatory act was the termination. The failure to rehire may also constitute retaliation, and the extent to which these acts may be separated and analyzed independently, or are interrelated, lies at-the heart of the parties’ theories of the case.
As to the prima facie question of 'causation, we conclude Donathan has met her burden. Donathan was terminated from her office position even though Oakley Grain had not included the office position in its seasonal layoffs any of the prior three years that Donathan had worked for the company (or during the years when *741 Donathan’s predecessor held the post). Do-nathan’s termination occurred despite the absence of negative reviews, and Oakley Grain hired Fletcher to fill the position the very next working day. Notably, Fletcher was not licensed to grade grain and had to forge Donathan’s signature on grain slips.
In addition, temporal proximity serves as further and strong evidence of causation in the context of the present case. See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 761 (8th Cir. 2004) (temporal proximity of six days coupled with other evidence sufficient to create jury question). Dennis Oakley forwarded Donathan’s letter to Porter upon receiving it and called Porter to discuss the letter even before Porter had viewed it. After a delay of just a few minutes for Porter to read the letter, the men discussed the letter, during which discussion Porter admittedly advised Dennis Oakley of the intent to lay off workers. A rational finder of fact could infer from the discussion of layoffs during the phone call about Donathan’s letter that Porter and Dennis Oakley decided terminate Donathan’s employment at that time — the same day as her protected act. Even taking the day of her termination as the date of the adverse action, however, a delay of a mere eight days in this case is strong evidence of causation in light of the other evidence. See Id.
Defendants’ articulated rationale for laying off Donathan on Friday, January 31, 2014, was economic necessity tied to a seasonal downturn in grain intake. The articulated rationale for not rehiring Dona-than the following working day, Monday, February 3, 2014, was the fact that Dona-than had not completed the workday on January 31 after receiving her termination letter.
Donathan points to the evidence just discussed concerning her prima facie case and more to demonstrate the asserted rationales were not the true motivation for the adverse actions. For example, although Defendants argue Norman called in the surprise grain order on Saturday following the layoffs and workers were needed to process the new order, Defendants produced no contract to establish the timing of this “surprise” order. When asked about a written contract for a different order, Porter responded that Oakley Grain would have a contract. When asked about a written contract for the asserted surprise order, Porter responded there was no written contract. Further, the fact that Norman was the merchandiser who purportedly secured the timely surprise order is material in light of Donathan’s argument that Defendants are dissembling to hide a retaliatory motive. It is also material in light of the evidence that Norman was one of the people who received Donathan’s letter even though he is not asserted to have had any supervisory authority over Donathan and did not work at the Yellow Bend facility.
Donathan also notes that, although Oakley Grain generally would lay off seasonal outdoor workers during annual slowdown, Oakley Grain took the opportunity of the January 31 layoffs to terminate plant supervisor Doug Wilson for performance reasons. This undisputed fact demonstrates the January 31 layoffs were not merely due to a post-harvest slowdown. And, after Porter had the layoff notices delivered, he reported to Dennis Oakley that he had laid off Donathan and Wilson, but did not mention that he had laid off the seasonal workers. A rational jury could conclude the motivations for terminating Donathan and Wilson were different than for the seasonal workers. And, because there is no evidence of poor reviews, poor performance, or other possible reasons for Donathan’s termination beyond the purported work *742 shortage and her protected act, a reasonable jury could conclude the protected act was the but-for cause of her termination.
Moreover, after Oakley Grain hired Fletcher out of purported necessity to address the surprise Saturday order, she remained in Donathan’s position through at least July 2015. This strongly suggests Oakley Grain at no time intended to leave the office position unfilled. Rather, Oakley Grain’s hiring and subsequent long-term, continuous retention of Fletcher in Dona-than’s position (notwithstanding Fletcher’s shortcomings) corroborates Oakley Grain’s desire to maintain the position at all times. This conclusion is wholly consistent with Oakley Grain’s multi-year pattern of protecting the office position through prior years’ seasonal layoffs of non-office laborers.
It is also consistent with detailed deposition testimony from Porter. Porter admitted that, although he stated he terminated Donathan for “budget reasons,” he could not recall how big the order for grain was that supposedly necessitated the hiring of Fletcher. He recalled, however, that the order was filled within “[a] few weeks,” and that he didn’t terminate Fletcher after the order was filled because “[a]t the time I was needing her ... [for] [o]ffice work, someone to do the payroll, answer the phone.” He also indicated that, from a time shortly after the Yellow Bend facility opened, the facility had never operated without an office employee to handle such tasks. In fact, in response to the question “And from day one to now, you have always had one person in the office,” he stated, ‘Yeah, I try to keep one person in the office.” Also, although Porter indicated he retained Fletcher for functions including payroll, it is undisputed that Fletcher had no payroll experience and could not perform payroll duties. A rational jury could easily conclude Defendants terminated Donathan in retaliation for her eom-pláint and did so under the auspices of eliminating a position out of economic necessity all the while harboring the intent to keep her position continuously filled.
The parties spend much of their briefs arguing about the relative meaning and weight to be accorded temporal proximity. This issue, of course, is well trod, territory so we need not dwell on it at length. Of note, however, are three points, all of which support a denial of summary judgment in the present case. First, there is no need to address the value of temporal proximity “standing alone” because temporal proximity does not stand alone in this case. Second, temporal proximity generally is of greater inferential weight when time frames are compressed. Whether we consider the time frame in this case to be ten minutes or eight days, it is a meaningful and compressed time frame. And third, our court has often expressed an inclination to discount temporal proximity due to the perceived risk that employees who anticipate discipline or adverse actions might preemptively engage in protected conduct to complicate or forestall such discipline or to set the stage for later retaliation claims. See, e.g., Wilson v. Ark. Dept. of Human Servs., 850 F.3d 368, 376 (8th Cir. 2017) (Loken, J., concurring in part and dissenting in part) (interpreting the Nassar standard “as instructing' lower courts to stop letting contrived retaliation claims hijack or. delay legitimate employer performance decisions”); Hervey v. Cty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (“Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action.”). The present record, however, is wholly devoid of evidence even remotely suggesting there existed any facts that might have given Donathan reason to anticipate discipline or adverse action. Her position had been repeatedly preserved through many years’ seasonal layoffs of outdoor workers, *743 and the only fair reading of the present record is that she was a valued employee who served many functions. Temporal proximity, therefore, is more meaningful in a case such as the present one where it is impossible to infer timing issues arise from an employee’s calculated or strategic engagement in protected conduct.
Finally, to the extent Defendants attempt to divorce the Friday termination from the Monday failure to rehire, Defendants ask the court to impermissibly view the record in the light most favorable to the moving party. Defendants argue Dona-than’s failure to complete the workday on Friday was intervening unprotected conduct separate and apart from any earlier protected actions. Because we conclude a rational jury could find impermissible retaliatory animus was the but-for cause of Donathan’s Friday termination, we cannot view the hiring decision the following working day on a clean slate. Nor can we view Donathan’s failure to stay at Yellow Bend after receiving her termination letter as intervening conduct. Simply put, a reasonable jury could conclude the employer’s Friday morning animus still drove the Monday decisions. This is especially true in light of the absence of evidence suggesting prior harsh discipline — or any discipline — of Donathan and in light of the de minimis nature of the purported infraction (leaving the workplace upon termination when not having been asked to remain and when the termination letter itself listed that day’s date as the effective date of the termination).[5]
We reverse the judgment of the district court.

. A different version of the termination letter, provided by Oakley Grain to the EEOC in this matter stated merely “your position” and did not identify Donathan’s position by title. Rather, it stated only, "It is with regret that I inform you are being laid off from your position effective January 31, 2014.” In his deposition in this case, Porter stated he did not know why the documents were different.

. Oakley Grain notes that Donathan did not produce any of Oakley Grain's receipts. Dona-than, however, asked for the grain receipts in discovery. Further, Oakley Grain does not suggest the company emails referencing Fletcher’s handwritten receipts misspelling Donathan’s name would be inadmissible evidence.

. The parties do not argue a more lenient standard applies under the state statute or the Equal Pay Act. Because we conclude Dona-than defeats summary judgment even under the Nassar standard, we need not address these other claims separately.

. Although our court occasionally notes that the burden-shifting framework need not be applied on a fully developed summary judgment record, the framing of arguments and logical inferences nevertheless remain the same. See, e.g., Hill v. Walker, 737 F.3d 1209, 1218-19 (8th Cir. 2013); Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005). The final step, regardless of how it is characterized, empowers the court to view the record with insight gained from the parties’ articulation of their positions and in view of the employer’s explanation for its actions. See, e.g., Malloy v. U.S. Postal Serv., 756 F.3d 1088, 1091-92 (8th Cir. 2014) (noting the fully developed nature of the summary judgment record, addressing the final step of "discrimination vel non” and analyzing the record in light of the employer’s "core justification”).

. The dissent starts by discussing what issues have been appealed and those not appealed and thus waived. It then goes on to decide the case on the basis of an issue Defendants expressly conceded in the district court and that is neither appealed nor briefed. See Defendants' District Court Brief in Support of Summary Judgment at 9; Transcon. Ins. Co. v. W.G. Samuels Co., 370 F.3d 755, 758 (8th Cir. 2004) ("We may affirm a judgment on any ground raised in the district court....") (emphasis added); see also Gunderson v. BNSF Ry. Co., 850 F.3d 962, 972 (8th Cir. 2017) (Colloton, J., concurring in part and concurring in the judgment) ("The discussion ... is pure dicta, on an issue raised sua sponte by my colleagues. Where the question is unnecessary to a decision, and without briefing or argument on the complex issues lurking therein, ... I express no views....”). • The dissent argues there was no protected conduct and thus nothing to retaliate against. The district court, however, determined in its summary judgment order that "Plaintiff’s complaint to Dennis Oakley... was a protected activity.” Defendants did not challenge that holding in this appeal, and in fact conceded in their brief to our court, “Donathan sent an email alleging discrimination based upon her gender which is considered to be protected activity.” Appellees’ Brief, at 11. The whole thrust of Defendants’ case was whether the subsequent layoff and refusal to rehire was done in retaliation for the protected conduct.
Because the issue was conceded in the district court, the evidentiary record on this issue is sparse. However, based on the record we do have, if we were to reach the issue of the reasonableness of Donathan’s complaint to Dennis Oakley, summary judgment would not be appropriate. The dissent seems to equate reasonableness with success on the merits of the equal pay claim while professing that is not the standard it is applying. The facts as set forth in the district court opinion establish, at a minimum, a jury question as to the reasonableness of Donathan’s complaint about the safety bonus. Safety bonuses were paid to non-office workers. Although the district court ultimately determined Donathan’s job classification as "grain weigher/grader and office staff” precluded her from receiving a safety bonus, there is significant evidence in the record that Donathan performed numerous outside duties. Thus, the record supports, at a minimum, submitting the reasonableness issue to the juiy.