# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2708

_____

Cathy Sellars, On behalf of herself and all others similarly situated; Claudia Lopez, On behalf of herself and all others similarly situated; Leslie Fortune, On behalf of herself and all others similarly situated

*Plaintiffs - Appellants*

v.

CRST Expedited, Inc.

*Defendant - Appellee*

------------------------------

Equal Employment Opportunity Commission

*Amicus on Behalf of Appellants*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: September 22, 2020
Filed: September 8, 2021

_____

Before KELLY, WOLLMAN, and STRAS, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Cathy Sellars, Claudia Lopez, and Leslie Fortune (hereinafter, the Plaintiffs) brought suit against their employer, CRST Expedited, Inc. (CRST), alleging Title VII claims of retaliation and hostile work environment on behalf of themselves and all others similarly situated, as well as individual constructive discharge claims on behalf of themselves. As relevant to this appeal, the district court granted summary judgment to CRST on the class and individual retaliation claims, as well as on the Plaintiffs' individual hostile work environment and constructive discharge claims. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Background

The Plaintiffs are female truck drivers who represent a class of women who drove for CRST between October 12, 2013, and December 5, 2017. Sellars drove for CRST between December 2013 and March 2014. Lopez drove for CRST between April 2014 and December 2014. Fortune drove for CRST between November 2013 and January 2015.

CRST is a long-haul trucking company whose drivers begin and end trips at designated CRST terminals around the country. Drivers also stay at the terminals between loads as needed. CRST's employment policies apply at the terminals, as well as on the trucks. CRST's drivers work in pairs so that one driver can sleep in the truck's bunks while the other continues to drive. Typically, once a driver has been hired, trained, and licensed, CRST does not directly pair the drivers. Rather, it signs off on a pairing after the drivers mutually agree to take on a truck load, provided that there are no Human Resources (HR)-based personnel limitations, such as a "male only" tag on a driver. CRST will occasionally facilitate a pairing among available drivers, who then mutually agree to drive together. Drivers earn an individualized

rate per mile depending on their experience (split-mileage rate). While on the truck, drivers can communicate with CRST management through a "Qualcom unit," a type of internal email and instant messaging system.

CRST's standard pay policy provides for two types of driver pay: an individualized split-mileage rate earned only while driving the truck, and set rates earned in other situations—such as layovers longer than 48 hours and time spent waiting for a road to become passable. If management removes a driver from a truck, CRST will pay for a hotel room and/or transportation to another CRST terminal or new load as needed. On or about July 1, 2015, CRST amended its standard pay policy such that drivers removed from a truck following a complaint of sexual harassment would receive a set rate of layover pay regardless of how long the layover lasted (HR layover policy).

Upon being hired, drivers receive a copy of CRST's sexual harassment procedures and acknowledge to management that they will report any sexual harassment that they experience so that they can be removed from the harassing situation. Once management receives a safety or harassment complaint from a truck-occupying driver, CRST's practice is to remove complainants from the complained-of situation as soon as practicable. CRST contends that removal is necessary, both for the safety of the complainants and for the facilitation of a prompt investigation by HR. As the only witnesses to harassment on the truck are often the complainant and the alleged harrasser, many complaints cannot be corroborated. Even in the absence of corroboration, however, CRST often designates an accused male driver as "male only," which precludes him from future pairings with female drivers.

In addition to the general sexual comments by coworkers, each of the Plaintiffs complain of multiple incidents of sexual harassment during their time at CRST. Included below are those specific incidents having a clearly established timeline in the record.

Sellars complains of at least three separate incidents of sexual harassment by three different male CRST employees during her employment. During her onboard training at CRST's terminal in December 2013, Sellars reported to her supervisor that a male CRST driver, Lydell Wilkerson, had made inappropriate sexual comments to her and propositioned her for sex. CRST sent Wilkerson out of the terminal to meet another load, after which Sellars was not again bothered by him. In January 2014, CRST assigned a male lead driver to train Sellars. While on the truck, this lead driver made sexual comments to Sellars, masturbated in her presence while inviting her to "join him," and attempted to remove Sellars's shirt while she was sleeping. Within six hours of Sellars's complaint to management about the lead driver's conduct, she was removed from the truck and Karen Carlson, an HR employee, began an investigation. This lead driver was thereafter moved to male only status. In February 2014, while still in training, Sellars reported to CRST's dispatch that another male lead driver, Dwain Monroe, had shown pornographic images to her on his phone, made sexual innuendos, and displayed a knife upon learning of her report. In response, CRST again removed Sellars from the truck and conducted an investigation. Although CRST could not corroborate Sellars's complaint and police did not find a knife during their search of the truck, Monroe was ordered to have no further contact with Sellars. Sellars terminated her employment with CRST in March 2014.

Lopez complains of at least four separate incidents of sexual harassment by four different male CRST employees during her employment. While onboarding at CRST's terminal in April 2014, Lopez complained to management that a male student driver had made multiple inappropriate sexual comments to and about her. Specifically, the driver allegedly told others that he was going to "come back for" Lopez and "rape and marry" her after training. Lopez also reported that he had asked her personal and suggestive questions and made her physically uncomfortable by rubbing her back and attempting to force her to hug him. CRST investigated and then placed the student driver on male only status. In July 2014, Lopez complained to her driving manager that her male co-driver had made sexual advances and comments

while they were on the truck, had given her gifts that made her uncomfortable, and had attempted to kiss her. She also reported that she had awakened to find him sitting on her bunk stroking her hair. Lopez alleges that when she rebuffed his advances, he eventually drove away and left her stranded. No longer on the truck, Lopez did not report the harassment until her driving manager contacted her, whereupon CRST investigated and moved the co-driver to male only status. While on a truck with a different male co-driver in October 2014, Lopez awakened to find him naked, penis erect, on top of her. Lopez complained to management but asked to be allowed to remain on the truck and continue on to the Oklahoma City terminal. Based on Lopez's complaints and despite her request to stay with the load, CRST arranged for Lopez to exit the truck as soon as practicable, arranged for other transportation for Lopez to Oklahoma City, and investigated. Lopez quit in December 2014 after a third co-driver told her he "could kill [her] and leave [her] in the mountains" without anyone knowing, an incident that Lopez did not report to CRST.

Fortune complains of at least four separate incidents of sexual harassment by four different male CRST employees during her employment. During Fortune's November 2013 training, her assigned lead driver made multiple sexual advances toward her, including inviting her to share a bed and asking about her sexual preferences, while telling her that he had "never been with a colored woman before." When Fortune complained to CRST's safety representative at the terminal, CRST removed her from the truck, investigated the complaint, and terminated the lead driver for other reasons. Fortune completed her student driver training with Lydell Wilkerson without incident. Fortune alleges that later that month her first co-driver, James Parker, propositioned her for sex and viewed porn and masturbated in her presence. Fortune exited the truck at a truck stop and contacted her driving manager. Although the manager initially asked Fortune if she could stay on the truck and work it out, Fortune found another ride back to CRST's terminal. At the terminal, Parker spread rumors that Fortune was "a lot lizard," trucker slang for "prostitute," and continued making threats. HR minimally investigated both incidents and moved

Parker to male only status. In May 2014, Fortune's male co-driver made suggestive comments about Fortune's looks, told her he "needed to know if she was clean" (impliedly from sexually transmitted diseases), and asked to get into the bunk with her. When Fortune rebuffed him, he became angry and hostile and refused to help her maneuver the truck. Fortune complained, and CRST made arrangements for her to exit the truck at the Oklahoma City terminal, where Fortune complained to her driving manager, as well as via the HR hotline. CRST claims that the driver was prohibited from contacting Fortune again. In August 2014, Fortune complained that her then co-driver, Charles Pickens, touched her inappropriately while on the truck and asked to get into bed with her when she awakened to find him standing over her bunk. Fortune alleges that Pickens left only after she told him about the knives she kept for self-protection. After reporting the incident to CRST, Fortune got off the truck.

The Plaintiffs brought both individual and class Title VII retaliation claims alleging that CRST maintained a pattern or practice of discrimination against women who complain about sexual harassment. The district court certified a class of female drivers who drove for CRST after October 12, 2013, and were required to "exit the truck in response to their complaints of sexual harassment." D. Ct. Order of March 30, 2017, at 55. Between October 12, 2013, and December 5, 2017, there were 135 instances of female drivers exiting CRST trucks after complaining of sexual harassment. In light of CRST's July 1, 2015, change in pay policy, the district court treated those members of the class who drove for CRST prior to July 1, 2015, as one group (the pre-2015 class members) and those members who drove for CRST after July 1, 2015, as a second group (the post-2015 class members). There is no dispute that the Plaintiffs' individual retaliation claims are identical to the class retaliation claims of the pre-2015 class members.[1]

---

[1]Sellars, Lopez, and Fortune each terminated her employment with CRST prior to July 2015.

Pursuant to Federal Rule of Civil Procedure 23(c)(4)(A), the district court also certified the question "whether CRST has a policy, pattern or practice of retaliating against women complaining of sexual harassment by requiring them to exit the truck except when they are a lead driver or owner-operator." D. Ct. Order of March 30, 2017, at 55. CRST conceded in its brief in support of its motion for summary judgment that its practice was to remove complainants from the complained-of situation unless there were special circumstances involved. The district court's order granting summary judgment instead addressed, as a "threshold issue" for each group of class members, "whether there [was] a genuine issue of material fact as to whether CRST has a policy, pattern or practice or 'standard operating procedure' of not paying women who complain of sexual harassment." D. Ct. Order of Jan. 15, 2019, at 26.

With regard to the pre-2015 class members, the district court found a genuine dispute of material fact whether CRST maintained a policy of not paying women who complain of sexual harassment. The district court concluded, however, that there was no direct evidence of retaliation and that the Plaintiffs had failed to show pretext under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The district court granted summary judgment to CRST on the class retaliation claims of the pre-2015 class members, as well as on the Plaintiffs' identical individual retaliation claims, because there was no genuine dispute of fact whether the adverse employment action they experienced was in retaliation for their Title VII protected activity.

With regard to the post-2015 class members, the district court found that the Plaintiffs had not shown that CRST's policy of not paying women who complained of sexual harassment continued after the July 2015 change in pay policy. The district court accordingly concluded that there was no genuine dispute of material fact whether the post-2015 class members experienced an adverse employment action and also granted summary judgment to CRST on the class retaliation claims of the post-2015 class members.

Each Plaintiff also brought individual hostile work environment and constructive discharge claims.[2] The district court concluded that a reasonable jury could find that each Plaintiff was subjected to harassment severe and pervasive enough to constitute a hostile work environment. However, the district court found no genuine dispute of material fact with respect to CRST's liability for the alleged coworker-on-coworker harassment. Finally, the district court concluded that, although the conditions were intolerable, there was no genuine dispute of material fact whether CRST deliberately created intolerable working conditions with the intent that any of the Plaintiffs would resign. The district court accordingly granted summary judgment to CRST on the Plaintiffs' individual Title VII hostile work environment and constructive discharge claims.

We review grants of summary judgment *de novo*, making all reasonable inferences in favor of and viewing all genuinely disputed facts most favorably to the non-moving party. Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 911 (8th Cir. 2011). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II. Individual and Class Retaliation Claims

The Plaintiffs appeal the district court's grant of summary judgment on both the individual and class Title VII retaliation claims. There is no dispute that CRST's practice during the entire class period was to remove drivers who complained of co-driver sexual harassment from the truck as soon as practicable (CRST's removal policy). Complainants ceased to earn their split-mileage rate upon removal but

---

[2]Although the Plaintiffs initially brought a class hostile work environment claim, the district court decertified the hostile work environment class, a ruling that the Plaintiffs do not appeal.

remained eligible to earn the other types of pay provided for in CRST's standard pay policy. After CRST changed the pay policy in 2015, sexual harassment complainants became immediately eligible to receive layover pay upon removal.[3] CRST did not inform its employees of the changed HR layover policy, however, and so they learned of the change only upon complaining of sexual harassment. The Plaintiffs argue two theories of retaliation under Title VII: (1) that CRST's policy of removing complainants of sexual harassment is retaliatory *per se*; and (2) that there is a genuine dispute of material fact as to whether the Plaintiffs and the class were subject to an adverse employment action motivated by retaliatory intent.

Title VII prohibits employers from discriminating against any employee who complains of sexual harassment in the workplace. 42 U.S.C. § 2000e-3(a); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 63–68 (1986) (holding that sexual harassment may be actionable under Title VII as discrimination on the basis of sex if it is sufficiently severe and pervasive).

The Plaintiffs argue that CRST's removal policy is retaliatory *per se*. See EEOC v. Bd. of Governors of State Colls. & Univs., 957 F.2d 424, 428 (7th Cir. 1992) ("When an employee's participation in statutorily protected activity is the determining factor in an employer's decision to take adverse employment action, that action is invalid regardless of the employer's intent."). They claim that CRST's standard response to complaints about sexual harassment places a complainant on what amounts to an "unpaid suspension" because she ceases to earn a split-mileage rate upon removal. We have not previously applied the Seventh Circuit's "retaliatory *per se*" standard to find an employer's policy retaliatory on its face, and the facts of this case do not call for us to do so here. See Franklin v. Loc. 2 of the Sheet Metal Workers Int'l Ass'n, 565 F.3d 508, 520–21 (8th Cir. 2009) (considering whether a

---

[3]Prior to this change, drivers received layover pay only if they were off the truck for more than 48 hours.

policy of publicly announcing the names of EEOC complainants and the amount the organization paid in related legal bills at union meetings was retaliatory *per se*).

The record does not establish that an "unpaid suspension" policy exists. CRST's reactive response to a complaint is to remove the complainant from a truck and conduct an investigation. After removal, the complainant receives whatever pay he or she is entitled to under CRST's standard pay policy.[4] The Plaintiffs have not pointed to any evidence that CRST's removal policy applies differently to sexual harassment complainants than to complainants of other issues, such as safety.[5] Moreover, the Plaintiffs do not dispute that CRST's removal policy applies regardless of the complainant's gender. CRST's removal policy thus does not constitute *per se* retaliation in this case. See id. at 521 (declining to follow Board of Governors because the allegedly retaliatory policy at issue applied broadly to all legal bills and did not single out members who filed EEOC charges).

We turn then to whether the Plaintiffs have shown a genuine dispute of material fact that they suffered an adverse employment action in retaliation for their protected activity under Title VII. Once a plaintiff has alleged a materially adverse employment action, "[t]o survive a motion for summary judgment on a retaliation claim, [the plaintiff] either must offer direct evidence of retaliation or create an

---

[4]The Plaintiffs inaccurately characterize CRST's policy as placing drivers on an "unpaid suspension." The record shows that, even for the pre-2015 class members, the net effect of removal on a driver's pay was dependent on a variety of factors, such as the length of the resulting layover, the driver's choice of action upon removal, and the availability of another load. Because at least some removed drivers did not experience a net decrease in pay after removal, the only allegedly retaliatory action taken by CRST was the removal of complainants from trucks.

[5]The record instead contains HR presentations which discuss the automatic removal of both safety and sexual harassment complainants.

-10-

inference of retaliation under the McDonnell Douglas burden-shifting framework." Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016) (internal citations omitted).

The alleged retaliatory action at issue is CRST's removal policy, a practice that affected all members of the class. Because the certified class consists of two groups who were subject to different pay policies upon removal from the truck, we address the pre-2015 class members—and the Plaintiffs' identical individual retaliation claims—separately from the post-2015 class members. For each group, we address whether a reasonable employee would have considered CRST's removal policy to be materially adverse. With respect to the pre-2015 class members and the Plaintiffs, we then consider whether the Plaintiffs have shown a genuine dispute that an "impermissible retaliatory motive [on CRST's part] was the but-for cause of the adverse employment action" that they suffered. Donathan v. Oakley Grain, Inc., 861 F.3d 735, 739 (8th Cir. 2017) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352–53 (2013)). We do not reach the second question for the post-2015 class members, however, because the district court's grant of summary judgment was based only on its determination that those class members did not experience an adverse employment action.

A. Pre-2015 Class Members

Plaintiffs argue that CRST removed drivers from the truck in retaliation for their complaints of sexual harassments. Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). Thus, the Plaintiffs must show that CRST's removal practice was materially adverse—that it "might have dissuaded a reasonable worker from making" a sexual harassment complaint. Id. at 68 (internal quotation marks and citation omitted). Title VII's "antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms . . . by prohibiting employer actions that

are likely to deter victims of discrimination from complaining to . . . their employers." Id. (internal quotation marks and citations omitted). This is so because "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints" and "effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances." Id. at 67 (quoting Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292 (1960)).

The Plaintiffs argue that before the July 2015 pay policy change, a majority of complainants removed from trucks experienced a net decrease in expected pay following removal, and that a reasonable employee in the pre-2015 class members' position would therefore have found CRST's removal practice materially adverse. See id. (adopting objective standard to determine whether an action is adverse), see id. at 70 (believing that an objective standard would "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining . . . about discrimination."). We agree. CRST provided its drivers with its removal policy and its pay policy. Drivers were thus aware that complaining of sexual harassment would result in their removal from the truck and that, upon removal, they would cease earning their split-mileage rate of pay. Under the pre-July 2015 pay policy, the drivers also knew that they would qualify for layover pay after removal only if their layover was longer than 48 hours. The record establishes that a vast majority of pre-2015 class members actually experienced a net decrease in pay upon removal. Thus, a reasonable employee in the pre-2015 class members' position would expect that complaining of sexual harassment would directly lead to a net decrease in pay. The Plaintiffs have therefore shown that CRST's removal policy was materially adverse under Burlington Northern, 548 U.S. at 67–68; cf. Mitchell, 361 U.S. at 292 ("[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions."). We turn then to the question whether the Plaintiffs have shown that, for the pre-2015 class members, this adverse employment action was in retaliation for their Title VII-protected activity.

We first consider whether the Plaintiffs have presented direct evidence of retaliation—that is, "evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." Young-Losee, 631 F.3d at 912 (citing Burlington N., 548 U.S. at 57, 68). "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). "Direct evidence . . . must relate to people with decision-making authority" and does not include "stray remarks in the workplace" or "statements by nondecisionmakers." Moody v. Vozel, 771 F.3d 1093, 1096 (8th Cir. 2014) (internal citation omitted).

The Plaintiffs point to presentation slides from CRST's 2014 weekly HR employee relations meetings as "direct evidence of retaliation." A slide titled "Questions / Discussion Items" included the following language:

> When drivers raise allegations of sexual or other issues of harassment, and we remove them from the truck . . . why is it that the accused can stay on earning money and the accuser gets stranded at a motel and loses money every day and has to wait for a new co-driver . . . Punished for raising concerns.

The Plaintiffs allege that this characterization of CRST's removal policy as "punishment" constitutes direct evidence of retaliation sufficient to enable their claims to survive summary judgment. We disagree.

It is unlikely that this discussion question in an HR meeting could be considered a "comment by a decisionmaker." Cf. Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011) (en banc) (comments by a commissioner not involved in the hiring process were not direct evidence of discrimination where there was "no evidence [that the commissioner] influenced the ultimate decisionmaker"). Title VII

-13-

was designed to encourage employers to take steps to prevent harassment and to offer effective grievance mechanisms. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764 (1998). Employers would have little incentive to critically examine their policies in a systematic and documented way if a single HR discussion question could be construed as a comment made on behalf of the company.

Even if the presentation slide were considered to be a statement by a decisionmaker, the discussion question itself does not show a "specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." Torgerson, 643 F.3d at 1046. Read in context, it is apparent that this slide was intended to question CRST's removal policy and lead to a discussion about whether it should be changed rather than continued. Cf. Lors v. Dean, 746 F.3d 857, 867 (8th Cir. 2014) (an email from the employee's nondecisionmaker team leader advocating for *filing a preemptive claim* against the employee was not sufficient direct evidence that the employee was *terminated* in retaliation for his protected activity). At most, this was a stray comment that questioned—rather than supported—the allegedly discriminatory policy, and thus it does not reflect any motivative discriminatory bias on the decisionmaker's part.

In the absence of any direct evidence of retaliation, we apply the McDonnell Douglas burden-shifting framework to determine whether the Plaintiffs have raised an inference of retaliation. The Plaintiffs have the initial burden of establishing a prima facie case of retaliation by showing "that [they] engaged in statutorily protected conduct, that [they] suffered an adverse employment action, and that a causal connection exists between the two." Hutton, 812 F.3d at 684 (internal citation omitted). The burden then shifts to CRST to offer legitimate, non-retaliatory reasons for the alleged retaliatory action before the burden shifts back to the Plaintiffs to show that those reasons were pretext for retaliation. Donathan, 861 F.3d at 740.

Evidence of pretext "is viewed in light of the employer's justification." Hutton, 812 F.3d at 685 (internal citation omitted).

It is not difficult to show a prima facie case of retaliation, Donathan, 861 F.3d at 740, and we will assume that the Plaintiffs have done so here. The Plaintiffs do not dispute that CRST offered legitimate, non-discriminatory reasons—protecting the complainant's safety and responding properly to complaints of sexual harassment as required by our hostile work environment precedent—for the removal policy. See Torgerson, 643 F.3d at 1047 ("The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." (quoting Floyd v. Mo. Dep't of Soc. Servs., Div. of Fam. Servs., 188 F.3d 932, 936 (8th Cir. 1999))). We thus turn directly to the question of pretext. Hutton, 812 F.3d at 684.

To show pretext, the Plaintiffs must both discredit CRST's proffered reasons for the alleged retaliatory action and show that the circumstances permit drawing a reasonable inference that retaliation was the real reason for the adverse employment action. Id. (citing Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007)). The Plaintiffs do not question the credence of CRST's proffered safety justification. They instead point to the presentation slides' characterization of that policy as a "punishment" and claim that showing CRST's knowledge of the unchanged retaliatory policy is sufficient to show pretext. This contention finds no support in our precedent, see Donathan, 861 F.3d at 739 (the plaintiff must show that a retaliatory motive was the but-for cause of the adverse action), and lacks persuasiveness in light of our earlier discussion of the paucity of direct evidence. Having viewed the Plaintiff's evidence of pretext "in light of the employer's justification," we agree with the district court that they have not created a genuine dispute whether retaliatory intent likely motivated CRST here.

## B. Post-2015 Class Members

It is undisputed that CRST changed its pay policy in July 2015 such that sexual harassment complainants removed from trucks would immediately begin earning a set rate of layover pay. It is also undisputed that CRST did not inform its employees of the change in pay policy until after an employee had complained of sexual harassment. The change affected only complainants of sexual harassment, with safety complainants being handled on a case-by-case basis. According to CRST's Head of Human Resources, Angela Stastny, however, CRST intentionally did not inform its employees of the changed policy to "ensure [the HR layover policy was] used for the correct purposes." Because removed sexual harassment complainants no longer experienced a post-removal net decrease in pay, the district court concluded that the post-2015 class members did not suffer an adverse employment action and granted summary judgment to CRST on their class retaliation claim. The Plaintiffs argue, however, that even though CRST changed its pay policy to compensate removed sexual harassment complainants, its employees were left with the impression that those who complained of sexual harassment could continue to expect the same pay decrease that pre-July 2015 complainants experienced.

As discussed above, a reasonable employee before July 2015 would consider CRST's removal practice to be materially adverse because, due to the interaction of the removal policy and the pay policy, the employee would expect to experience a net decrease in pay after complaining. The record establishes that a reasonable employee after July 2015 would have the same expectation because CRST did not tell its employees about its changed pay policy. We therefore conclude that the post-2015 class members were subject to the same adverse employment action as that experienced by the pre-2015 class members.

Our conclusion is unaffected by the fact that the anticipated net decrease did not come to fruition. In <u>Burlington Northern</u>, White, a female employee filed an

EEOC complaint alleging gender-based discrimination. 548 U.S. at 58. She was subsequently transferred to a different, less-desirable work location, suspended without pay for 37 days, and later reinstated to her position and awarded backpay for the 37 days of suspension. Id. at 58–59. In ruling on White's Title VII retaliation claim, the Court adopted a reasonable employee standard to determine whether an action was adverse and held that a jury could reasonably conclude that White had suffered an adverse employment action even though the subsequent backpay award made her whole. Id. at 69–73. Under the standard established in Burlington Northern, an employer's action is materially adverse if it might dissuade a reasonable employee from complaining of sexual harassment, even if the employee is later made whole.

Applying Burlington Northern here, we conclude that CRST subjected the post-2015 class members to the same adverse employment action as the pre-2015 class members when it concealed the change to its payment policy. The district court thus erred in granting summary judgment on the ground that the post-2015 class members suffered no adverse employment action because they did not see an average net decrease in pay following removal. We leave to the district court to address in the first instance the question whether direct or circumstantial evidence establishes that CRST took this adverse employment action in retaliation for the post-2015 class members' Title VII-protected activity.[6]

### III. Individual Hostile Work Environment Claims

We turn next to the Plaintiffs' individual hostile work environment claims and consider their argument that CRST should be held directly liable for the

---

[6]Our affirmance of summary judgment in favor of CRST on the named Plaintiffs' individual retaliation claims raises a question on remand whether the surviving class members have a class representative who meets the requirements of Federal Rule of Civil Procedure 23(a).

coworker-on-coworker harassment each Plaintiff experienced.  This is not the first time that we have considered a hostile work environment claim based on sexual harassment experienced by female drivers on CRST's trucks.  In EEOC v. CRST Van Expedited, Inc. (CRST I), 679 F.3d 657 (8th Cir. 2012), we held (1) "that CRST's Lead Driver is not a supervisory employee," id. at 684, and (2) that as to the women who had shown a hostile work environment and had given actual notice of it to CRST, "as a matter of law, CRST promptly and effectively remedied any alleged harassment that the women reported," id. at 692–93.  See also Vance v. Ball State Univ., 570 U.S. 421, 448 (2013) (citing with approval CRST I's definition of a "supervisor" and its conclusion that the lead driver was a non-supervisory employee).  The Plaintiffs each allege incidents of sexual harassment similar to those alleged by the EEOC in 2012.  These individual hostile work environment claims must thus be considered in the context of CRST's post-CRST I actions.

To survive summary judgment on a hostile work environment claim, the Plaintiffs must establish a genuine dispute of material fact with regard to each Plaintiff "(1) that she belongs to a protected group; (2) that she suffered unwelcome harassment; (3) that there was a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of her employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." CRST I, 679 F.3d at 685 (quoting Sheriff v. Midwest Health Partners, P.C., 619 F.3d 923, 929 (8th Cir. 2010) (internal alterations omitted)).  In cases of coworker-on-coworker harassment, the employer is liable only if the employer's own negligence caused the harassment, Ellerth, 524 U.S. at 759, or led to the continuation of the hostile work environment, Engel v. Rapid City Sch. Dist., 506 F.3d 1118, 1123 (8th Cir. 2007).  The only question before us is whether CRST knew or should have known of the harassment and failed to take "prompt and effective remedial action that [was] reasonably calculated to stop the harassment," that is, whether CRST was negligent.  Id.; see also Vance, 570 U.S. at 449 ("Evidence that an employer did not

-18-

monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant" to whether an employer was negligent in failing to prevent harassment.).

Determining the existence of an employer's negligence involves a two-step inquiry: (1) whether the employer had actual or constructive notice of the conduct, CRST I, 679 F.3d at 690 (citing Sandoval v. Am. Bldg. Maint. Indus., 578 F.3d 787, 801 (8th Cir. 2009)), and (2) whether the employer took remedial action "reasonably calculated to stop the harassment," Engel, 506 F.3d at 1123. Ellerth, 524 U.S. at 759; see also Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 421 (8th Cir. 2010) ("If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment." (citing Engel, 506 F.3d at 1123)); CRST I, 679 F.3d at 693 ("CRST addressed reported harassment by (1) removing the woman from the truck as soon as practicable . . . ; (2) requesting a written statement from the woman; (3) relieving the woman of any future assignments with the alleged harasser; and (4) reprimanding the alleged harasser and barring him from team-driving with women indefinitely. These actions, not necessarily in combination, constitute the type of prompt and effective remedial action that our precedents prescribe.").

## A. Actual Notice to CRST

Fortune appeals her individual hostile work environment claim on the theory that CRST's post actual-notice response was not "reasonably calculated to stop the harassment." See Engel, 506 F.3d at 1123. Fortune alleges that, in response to her November 2013 complaint about Parker's harassment, the driving manager laughed, said, "you guys can work this out," and asked her to get back on the truck with Parker. Fortune argues that a jury could find that the harassment continued because, once back at the terminal, Parker referred to Fortune as "a lot lizard." She further argues that CRST was negligent by "instruct[ing] her to go back to the hostile

-19-

environment" following her complaint and then allowing Parker's harassment to continue at the terminal.

The record shows that Fortune did not return to the truck following her complaint and that CRST conducted an investigation. Moreover, although we assume that being described as "a lot lizard" constitutes harassment, such subsequent same-employee harassment does not independently establish that CRST was negligent with regards to the hostile work environment. Id. at 1125 (even though the employer's first remedial response did not end harassment of the victim by the same coworker, the remedial response was still adequate). Although we agree that CRST's driving manager might very well have better handled the situation, Fortune has not created a genuine factual dispute whether CRST's response was actionably deficient.

B. Constructive Notice to CRST

Each Plaintiff appeals her individual hostile work environment claim on a constructive-notice theory. Constructive notice of ongoing coworker-on-coworker harassment is established "(1) where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer, or (2) where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." CRST I, 679 F.3d at 690 (quoting Sandoval, 578 F.3d at 802) (internal modifications omitted). The Plaintiffs allege that the prior litigation against CRST, combined with ongoing reports of sexual harassment experienced by female drivers and concerns raised by HR employee Carlson about the effectiveness of investigations, put CRST on constructive notice of "a serious risk of sexual harassment in the workplace." The Plaintiffs thus argue that, post-CRST I, CRST's failure to change its otherwise adequate remedial response following continued complaints of harassment by different coworkers constituted negligence sufficient to subject CRST to direct liability for ongoing coworker-on-coworker harassment.

-20-

The Plaintiffs contend that, even prior to their actual complaints of sexual harassment, CRST had constructive notice of a serious risk of sexual harassment in the workplace that was not being effectively addressed by its current policies. We disagree. The Plaintiffs cite Sandoval v. American Building Maintenance Industries, Inc. in support of their argument that the decision in CRST I, coupled with the continued sexual harassment complaints, placed CRST on constructive notice of the risk of harassment. 578 F.3d at 802 ("nearly one hundred similar complaints" were relevant to the constructive notice determination). In Sandoval, however, we held only that the district court had erred by disregarding evidence of similar complaints without deciding whether this evidence created a genuine factual dispute as to the employer's constructive notice. 578 F.3d at 804 (Gruender, J., concurring in part and dissenting in part). Here, the district court properly considered evidence of prior litigation and continued complaints in its determination regarding the constructive notice issue.

Moreover, even though the Sandoval plaintiffs had presented some 68 reports of harassment, the district court found on remand that they had not established broad constructive notice to the employer. Sandoval v. Am. Bldg. Main. Indus., 765 F. Supp. 2d 1138, 1169–71 (D. Minn. 2010). Reports made by non-plaintiff victims about different harassers at separate worksites were not probative of whether the employer had constructive notice that sexual harassment was pervasive and open in an individual plaintiff's work environment. Id. at 1170. We find the district court's reasoning in Sandoval instructive— particularly so in light of the decentralized nature of CRST's work environment. The record shows that the actual incidents of harassment took place away from management's oversight and were perpetrated by employees with no known history of harassment. At most, CRST management had notice of a generalized risk of harassment, which is insufficient to establish the constructive notice of ongoing harassment necessary to trigger an employer's obligation to take preventative remedial action. CRST I, 679 F.3d at 690; cf. Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir. 1981) (holding that employer toleration of an

ongoing "opprobrious racial atmosphere" which was "so pervasive and so long continuing . . . that the employer must have become conscious of it" was a violation of Title VII).

Employers are not to be held strictly liable for a hostile work environment created by non-supervisory employee harassment. Engel, 506 F.3d at 1123 (describing our standard as one of negligence); cf. Ellerth, 524 U.S. at 763, 765 (allowing employers to raise an affirmative defense to vicarious liability when supervisor harassment did not differ from coworker-on-coworker harassment); Faragher v. City of Boca Raton, 524 U.S. 775, 798–800 (1998) (discussing the consensus that the negligence standard applies to claims of employer liability for coworker-on-coworker harassment). We thus decline the Plaintiffs' request that liability be assessed on the basis that CRST "knew or should have known [the] Plaintiffs *would be* harassed" because it was "on notice of a serious risk that *any* female driver was *likely* to be sexually harassed." The Plaintiffs' proposed standard would require CRST to assume, on the basis of complaints about individual male drivers, that any and every CRST male driver would be a sexual harasser.[7]

Even in the face of constructive notice, an employer is not liable if it takes prompt remedial action that is reasonably calculated to stop the harassment. CRST I, 679 F.3d at 692–93 (depending on the particulars of a situation, "employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination" are acceptable remedial options for employers to take (internal emphasis omitted) (quoting Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999))). The Plaintiffs argue that, given the constructive notice to CRST that its

_____

[7]The Plaintiffs' own evidence shows that Driver Wilkerson trained Fortune on a truck without incident only a month before Sellars complained of sexual harassment by him. Under the Plaintiffs' standard, CRST would be required to assume, despite the lack of any evidence to that effect, that Driver Wilkerson might well later engage in the conduct alleged against him.

policies were not preventing harassment by employees whom it had no reason to suspect of being harassers, CRST should have taken additional steps—beyond those that presumably remedied the threat of repeat harassment by known harasssers—to affirmatively prevent future harassment.[8]  Although employers may be required to escalate their response to repeated harassment by the same coworker, see e.g. Engel, 506 F.3d at 1125, we have not adopted the Ninth Circuit's requirement that an employer's remedial response to harassment must deter future harassment by any offender in order to be reasonable, Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 875–76 (9th Cir. 2001).  We decline to do so here.

CRST's response to those complaints of sexual harassment of which it had actual notice was consistent with that which we previously deemed adequate as a matter of law in CRST I, 679 F.3d at 693.  The Plaintiffs nevertheless argue that CRST's response was rendered unreasonable by its continued receipt of new sexual harassment complaints from female drivers following CRST I.  They cite in support Tademy v. Union Pacific Corp., 614 F.3d 1132, 1148 (10th Cir. 2008), in which the Tenth Circuit concluded that a reasonable jury could conclude that an employer's failure to investigate recurring racial graffiti in the workplace signaled to employees that racial harassment would not be taken seriously and thereby contributed to later harassment by other coworkers.  Tademy is distinguishable, as the Plaintiffs have not

---

[8]The Plaintiffs argue that CRST should have placed cameras on the truck to better monitor the trucks and assist with investigations.  CRST contends that, in light of the time drivers spend on the trucks, on-truck cameras would subject drivers to near-constant surveillance.  An employer is required to take reasonable remedial action in response to allegations of harassment.  The Plaintiffs offer no support for the proposition that a reasonable employer here would go so far as to guarantee that such harassment be recorded.  Cf. Ellerth, 524 U.S. at 770 (Thomas, J., dissenting) (we require only that employers act reasonably because requiring employers to take "extraordinary measures—constant video and audio surveillance, for example . . . would revolutionize the workplace in a manner incompatible with a free society").

alleged that CRST's otherwise adequate response to prior complaints of sexual harassment tacitly encouraged the Plaintiffs' harassers.

Furthermore, none of the Plaintiffs have established that they suffered harassment from a known serial harasser. Contra Engel, 506 F.3d at 1125 (genuine issue of material fact whether the employer was on actual notice of the risk to the plaintiffs from a known serial harasser even though employer had taken adequate remedial action in response to a prior complaint by another victim). The Plaintiffs alleged that they experienced sexual harassment by coworkers—none of whom had a known history of harassment—after CRST took remedial action in response to complaints about other coworkers. Contrary to the Plaintiffs' contention, that fact alone fails to establish that CRST's response was not reasonably calculated to end the harassment. Cf. id. (employer's response to known harasser was reasonably calculated even though it was ineffective).

The Plaintiffs have thus not established the existence of a genuine dispute of material fact whether CRST knew or should have known about ongoing coworker-on-coworker harassment and thereafter failed to take prompt remedial action that was reasonably calculated to end it.

IV. Individual Constructive Discharge Claims

Finally, we turn to the Plaintiffs' argument that they were not required to show deliberate action by CRST as a prerequisite to the prosecution of a constructive discharge claim.

"Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." Engel, 506 F.3d at 1127 (quoting Tatum v. Ark. Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005)). "An employee claiming constructive discharge shoulders a substantial

-24-

burden." Blake v. MJ Optical, Inc., 870 F.3d 820, 826 (8th Cir. 2017). However, "[w]e do not . . . require an employee to [prove] . . . that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along." Green v. Brennan, 136 S. Ct. 1769, 1779–80 (2016) (discussing the triggering of the limitations period on a constructive discharge claim). The Plaintiffs interpret this pronouncement in Green as tacitly overruling our constructive discharge precedent. They argue that their claims should have survived summary judgment because they showed that "conditions were so intolerable that a reasonable person would have felt compelled to quit."

Although Green makes clear that the employee is not required to show that the employer subjectively intended for the employee to quit, the existence of intolerable conditions alone remains insufficient to form the basis of a constructive discharge claim, for the intolerable conditions must be attributable to the employer. Id. at 1780 (requiring the employee to prove "discrimination [by the employer] so bad that he had to quit"); see also Garrison v. Dolgencorp, LLC, 939 F.3d 937, 943 (8th Cir. 2019) (to prove constructive discharge under the ADA, the employee must still show that the employer itself *created* the intolerable working conditions (emphasis in original)); cf. Pa. State Police v. Suders, 542 U.S. 129, 131–32 (2004) (noting that official employer action may or may not underlie a constructive discharge claim but that where there is no official action, the employer may establish the Ellerth and Faragher affirmative defense of proving that it took steps to avoid or minimize the harm). As discussed above, the Plaintiffs have failed to show such discrimination on the part of CRST itself and therefore have failed to show that the employer created intolerable working conditions or took otherwise discriminatory action.

V. Conclusion

The incidents of sexual harassment alleged by the Plaintiffs are disquieting at best, revolting at worst. However, "Title VII . . . is not a general civility code for the

American workplace." Burlington N., 548 U.S. at 69. The Plaintiffs have largely failed to overcome Title VII's limits on employer liability. See Ellerth, 524 U.S. at 764 (discussing Title VII's limits on employer liability); Faragher, 524 U.S. at 792 (interpreting Meritor, 477 U.S. at 72, as "establishing the rule that some limitation [on employer liability] was intended [in Title VII]").

We affirm the district court's grant of summary judgment on the Plaintiffs' individual retaliation claims, hostile work environment claims, and constructive discharge claims. We also affirm the district court's grant of summary judgment on the pre-2015 class members' class retaliation claim. We reverse the district court's grant of summary judgment on the post-2015 class members' class retaliation claim and remand that claim to the district court for further proceedings consistent with the views set forth in this opinion.

_____